IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Lisa M. Tench,                                )
                                             )        Civil Action No. 6:13-595-RBH-KFM
                            Plaintiff,        )
                                             )        **REPORT OF MAGISTRATE JUDGE**
            vs.                              )
                                             )
Carolyn W. Colvin, Acting                    )
Commissioner of Social Security,[1]          )
                                             )
                            Defendant.        )
_____)

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on October 2, 2007, alleging that she became unable to work on June 15, 2006. The applications were denied initially and on reconsideration by the Social Security Administration. On May 6, 2008, the plaintiff

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing.  The administrative law judge ("ALJ"), before whom the plaintiff and Benson Hecker, an impartial vocational expert,  appeared on July 17, 2009, considered the case *de novo*, and on October 26, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on March 9, 2010.  On March 18, 2010, the plaintiff sought judicial review of the the Appeals Council's decision (*Tench v. Comm'r of Soc. Sec.,* 6:10-cv-00691-RBH).   On August 25, 2011, this court reversed and remanded the Commissioner's final decision pursuant to sentence four of 42 U.S.C. § 405(g).   In its remand order dated October 24, 2011, the court directed the ALJ to state the weight given to Dr. G. Timothy Baxley's opinion and to evaluate the claimant's subjective complaints (Tr. 705-18).

On May 4, 2012, the ALJ convened, but continued, a new hearing so that he could subpoena Kevin Moore, an acquaintance of the plaintiff, and Dr. Baxley[3] to testify (Tr. 664-69).  On August 15, 2012, the ALJ held a third hearing where the plaintiff, who was represented by attorney W. Grady Jordan, and an impartial vocational expert, Robert E. Brabham, Sr., appeared and testified (Tr. 576-643).  On September 10, 2012, the ALJ issued another unfavorable decision (Tr. 542-69), and on February 12, 2013, the Appeals

---

[3]The record shows that, on May 4, 2012, Chong Thao, a Senior Case Technician at the Office of Disability Adjudication and Review, left a message with Dr. Baxley's nurse requesting his presence at the hearing. On May 8, 2012, a person named Melissa returned Mr. Thao's call, but informed him that Dr. Baxley charged $600.00 per hour and "ha[d] to have three hours minimum." She also stated the "[f]ee must also be paid first before he c[ame]" (Tr. 737). On May 16, 2012, Mr. Thao again contacted Dr. Baxley's office and left a voice mail "giving them the date of Aug[ust] 15th in the afternoon, starting at 1:00 P.M." Mr. Thao stated that "if [he] did not hear from them the next day, this time w[ould] be set and a notice would be forthcoming." On May 17, 2012, Melissa left a voice mail for Mr. Thao, informing him that "she [was] not allowed to schedule anything unless they ha[d] received the $1,800.00 up front first" (Tr. 738). On June 26, 2012, the ALJ subpoenaed Dr. Baxley to testify on August 15, 2012 (Tr. 744-46). However, Dr. Baxley failed to appear at the hearing (Tr. 607-08).

Council denied the plaintiff's request for review.  The plaintiff filed this action for judicial review on March 6, 2013.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

(2)  The claimant has not engaged in substantial gainful activity since June 15, 2006, the alleged onset date (20 C.F.R. 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)  The claimant has the following severe combination of impairments:  obesity, mild cervical degenerative disc disease, fibromyalgia, depression and  anxiety (20 C.F.R. 404.1520(c) and 416.920(c)).

(4)  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)  After careful consideration of the entire record, I find that the claimant has the RFC to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) (lift/carry, push/pull 10 pounds occasionally, less than 10 pounds frequently, sit about 6 out of 8 hours, and stand/walk about 2 out of 8 hours).  She can occasionally climb ropes/ladders/scaffolds and frequently perform all other postural activities and should avoid concentrated exposure to hazards.  She can concentrate, persist, and work at pace to do simple, routine, repetitive tasks at one and two step instructions for 2-hour periods in an 8-hour day.  She can interact occasionally with the public, and interact appropriately with co-workers and supervisors in a stable routine setting.

(6)     The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)  The claimant was born on October 22, 1968, and was 37 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

3

(8)  The claimant has at least the equivalent of a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964

(9)  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11)  The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2006, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged

4

in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith*

5

*v. Schweiker*, 795 F.2d 343, 345 (4ᵗʰ Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4ᵗʰ Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4ᵗʰ Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4ᵗʰ Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff alleges disability beginning June 15, 2006.  She was born on October 22, 1968, and was 37 years old on her alleged disability onset date.  She was 43 years old on the date of the ALJ's decision.  She did not finish high school but earned a GED.  The plaintiff has past relevant work experience as a food preparation worker, laundry worker, and seamstress.

In June 2006, the plaintiff presented to Lee Ann Butts, a nurse practitioner in Dr. Billy Campbell's office, with complaints of dizziness and lightheadedness.  The plaintiff's examination was normal in all respects (Tr. 228-30).  At a followup appointment in November 2006, the plaintiff was seen by Kimberly Speer, a nurse practitioner, for complaints of mood swings due to her pregnancy.  She reported no recent history of recurrent depression or recurrent anxieties.  Examination revealed a regular heart rate and rhythm, good muscular strength and coordination, and full range of motion of the shoulders, elbows, hands, knees, and ankles.  Ms. Speer diagnosed unspecified anxiety and

6

prescribed medication (Tr. 224-28). In June 2007, the plaintiff presented to Kristin Meyers, a physician assistant under the supervision of Dr. Campbell, who noted that Prozac controlled the plaintiff's depressive symptoms very well (Tr. 221-23).

In October 2007, the plaintiff presented to Dr. Jerry Sherrill with complaints of lower back pain radiating into the left lower extremity. Dr. Sherrill found the plaintiff had no joint swelling or erythema. She had severe pitting pedal edema (swelling) and questionably positive straight leg raising tests bilaterally. She had good fine motor activity bilaterally and no fasciculations (spasms) or atrophy, although she had weakness in her left leg. She had normal reflexes, except at her left ankle. She had a slightly antalgic gait and normal sensation, except for suppressed pinprick testing in her left leg. Dr. Sherrill diagnosed chronic back pain and question of left L5 radiculopathy and prescribed medications. An EMG/NCV study was fairly normal. Dr. Sherrill opined that the plaintiff most likely had fibromyalgia (Tr. 327-36).

The plaintiff was also evaluated by Dr. Ravi Chandran for complaints of shortness of breath. Examination was normal, and a pulmonary function study was relatively normal with a mild impairment of diffusion capacity (ability of the lungs to transfer gases). Dr. Chandran assessed dyspnea (difficult or labored respiration) and prescribed medication (Tr. 256-57, 313-15).

A lumbar MRI conducted on November 1, 2007, revealed disc desiccation and a mild central disc protrusion at L5-S1. It was noted that the left and right L5 nerve roots exited the spinal canal normally (Tr. 322). On November 7, 2007, the plaintiff presented to Dr. Sherrill for a followup appointment, complaining of back pain and numbness in her left leg. Dr. Sherrill assessed left peroneal palsy and prescribed medication (Tr. 333).

On December 27, 2007, Ms. Meyers indicated the plaintiff was diagnosed with depression, which resulted in no work-related limitations (Tr. 342).

On January 9, 2008, Dr. Robbie Ronin reviewed the plaintiff's records and completed a Psychiatric Review Technique form and determined that the plaintiff's impairments did not cause any significant mental restrictions (Tr. 343-55).

On January 29, 2008, the plaintiff presented to Dr. Amir Agha with complaints of chronic pain. Examination revealed negative (normal) straight leg raises, tenderness in the lower back, no swelling of the joints, and painful fibromyalgia points. Dr. Agha assessed fibromyalgia and prescribed medication, but did not assess any functional limitations (Tr. 361-62).

During February 2008, the plaintiff returned to Dr. Campbell's nurse practitioner for a followup appointment. Examination revealed a normal respiration and heart rate, full range of motion of the extremities, good bilateral muscular coordination and strength, and normal deep tendon reflexes. The nurse practitioner diagnosed depressive disorder. She noted that, despite being on Prozac, the plaintiff felt depressed, and she could have postpartum depression. She also diagnosed controlled myalgia and myositis. The nurse practitioner prescribed Ambien and encouraged the plaintiff to start walking (Tr. 364-66).

On March 19, 2008, after reviewing the plaintiff's records, Dr. Dale Van Slooten completed a Physical Residual Functional Capacity Assessment form. He determined the plaintiff could lift 50 pounds occasionally and 25 pounds frequently, stand and/or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday, i.e., she could perform the exertional requirements of medium work (Tr. 370-77).

On March 21, 2008, the plaintiff reported to Dr. Agha that she was no better. The plaintiff reported arthralgia, but no morning stiffness, joint swelling, decreased activities in daily living, sleep change, numbness, neck pain, low back pain, night pain, gouty

8

episodes, or radicular pain. She had no nodules, synovitis, or osteoarthritic symptoms, but muscle tenderness (Tr. 477).

On April 2, 2008, Dr. Campbell's nurse completed a form indicating that the plaintiff was diagnosed with depression, her attention and concentration were good, she did not exhibit any work-related limitations in functioning due to her mental impairment, and she was not severely depressed (Tr. 380).

On April 12, 2008, Xanthia Harkness, Ph.D., reviewed the plaintiff's records and completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form and determined that the plaintiff could perform unskilled work that did not require her to be in constant contact with the general public (Tr. 383-400).

On July 11, 2008, the plaintiff asked Ms. Meyers in Dr. Campbell's office for a handicapped placard for her car; but Ms. Meyers refused, stating she needed to get more exercise (Tr. 510-12).

On August 4, 2008, the plaintiff presented to the Oconee Medical Center emergency room with a four day history of back pain after bending over to pick up her small daughter. She denied paresthesias. Diane Busch, a physician assistant, found the plaintiff had full range of motion in her upper and lower extremities. She was very tender to palpation over her paraspinous muscles and was tender to palpation over the right sciatic notch. She also had normal reflexes and gait and walked without difficulty. She had intact sensation, but reported a positive straight leg raising test on the left (Tr. 486-88).

The plaintiff saw Dr. Agha in March, July, and September 2008 for followup appointments. Dr. Agha diagnosed fibromyalgia, but did not assess any functional limitations (Tr. 475-77).

On October 28, 2008, the plaintiff presented to Dr. G. Timothy Baxley for evaluation and treatment of her fibromyalgia (Tr. 524). She saw Dr. Baxley again on November 13, 2008, for a followup appointment. Examination revealed normal deep

tendon reflexes and near normal bilateral strength in the upper and lower extremities (Tr. 522).  Examination at a December 1, 2008, followup appointment revealed similar results (Tr. 520).

Also in December 2008, the plaintiff presented to Dr. Michael Tebalt for evaluation and treatment of lower back pain and fibromyalgia.  A November 2008 lumbar MRI indicated desiccation and a mild disc protrusion at L5-S1.  Dr. Tebalt noted that the plaintiff did not appear to be in any acute distress until he began his examination.  The plaintiff expressed no interest in trigger point-type injections or epidural injections, citing an aversion to injection by needle, which Dr. Tebalt noted was "a bit ironic in that she [had] several tattoos, including a tattoo in the lower back area." Dr. Tebalt assessed fibromyalgia and lumbago and recommended intravenous lidocaine infusion therapy.  Over the course of the next several months, the plaintiff underwent lidocaine infusion therapy and reported good short-term relief.  She also indicated she wished to continue treatment periodically because it was extremely beneficial (Tr. 494-500).

On January 27, 2009, the plaintiff presented to Dr. Baxley with complaints of general pain and decreased bilateral grip.  The plaintiff reported mildly effective relief with medication.  Examination revealed normal deep tendon reflexes, numerous tender points, near normal strength, and no cyanosis or edema of the lower extremities.  Dr. Baxley assessed fibromyalgia and recommended that the plaintiff walk 20 to 30 minutes daily (Tr. 518-19).

In February 2009, the plaintiff reported to Dr. Tebalt that the therapy provided excellent relief for about three days, although she was "kind of vague as to whether she had any long term relief from the pain." She stated that, "the [three] days that her pain [was] greatly reduced [was] extremely beneficial to her," and she therefore underwent another infusion. Afterwards, she expressed some improvement in her pain (Tr. 495).

10

A February 2009 cervical MRI revealed degenerative disc disease most pronounced at C4-C5 and C5-C6 levels and some stenosis. At a followup appointment with Dr. Baxley on April 6, 2009, the plaintiff reported that lidocaine infusion therapy helped with her pain for several days. She complained of decreased strength in her lower extremities, particularly her right lower extremity, and some problems maneuvering steps and stairs. She requested a cane for safety with ambulation. She reported her sleep habits were somewhat improved, particularly the night following her lidocaine infusion. Dr. Baxley found she had normal reflexes, full strength in her upper and lower extremities, and intact sensation and gait. Dr. Baxley prescribed a cane and medications and recommended daily exercise with stretch bands (Tr. 516-17). On April 14, 2009, the plaintiff underwent another lidocaine infusion with improvement in her pain (Tr. 820).

On May 4, 2009, the plaintiff presented to the Oconee Medical Center emergency room with complaints of right hip and left ankle pain. She stated that she smoked a pack of cigarettes per day. While she had tenderness in her left ankle and right hip, she had intact range of motion in her right hip and all other extremities (Tr. 948-49).

On May 19, 2009, Dr. Baxley stated that the plaintiff's pain was "[p]rofound and intractable; [and] virtually incapacitated [her]." He stated that physical activity such as walking, standing, bending, stooping, and moving her extremities increased her pain "[t]o such a degree as to require increased medication from pain or substantial amounts of bed rest." He stated that the plaintiff's pain "[r]ender[ed her] unable to function at a productive work level" with respect to her ability to perform her previous work. He stated the plaintiff's medications "[l]imit[ed] the effectiveness of work duties or the performance of such everyday tasks such as driving an automobile, etc." He stated that the plaintiff's medications "[l]imited effectiveness due to distraction, inattentiveness, and drowsiness, etc.," with respect to her ability to perform her previous work activities. He further opined that the plaintiff's "[p]ain should diminish to an insignificant level in time, but m[ight] still be

present" and that medications and other treatment had "been used successfully in cases like this one." He stated the plaintiff sometimes needed unscheduled breaks every two to three hours for 15 minutes in a workday and she would miss about three days of work per month (Tr. 526-27).

On May 20, 2009, the plaintiff complained to Dr. Tebalt of pain all the way up and down her back. She rated her pain as an average of a 10 on a 10-point scale and a "50" when she came in. However, Dr. Tebalt stated she did not appear to be in much pain. He noted that she arrived at the clinic "eating a bag of McDonald's food and did not take the time to stop eating to do the pain assessment with the nurse. " He stated that, in her pain drawing, she just "circled her entire body." He noted she appeared "distracted and uninterested in the visit" and stated "she did not believe that overall [lidocaine infusions were] helping her very much." Dr. Tebalt noted that she "continued to eat her breakfast while she was speaking to [him] about her pain." He stated that, considering her poor response to lidocaine therapy, he did not see any reason to continue with it. He recommended light aerobic and stretching activity and prescribed medications (Tr. 818).

On July 13, 2009, the plaintiff complained to Dr. Baxley of low back and hip pain. Dr. Baxley recommended smoking cessation. He found the plaintiff had normal reflexes and full strength, and she was tender from her cervical to her lumbar spine. He administered trigger point injections, which the plaintiff stated seemed to help. He recommended stretching exercises and walking (Tr. 858, 860).

On August 3, 2009, the plaintiff presented to Marion McMillan, M.D., with complaints of chronic axial neck and low back pain. She reported low back pain since her childhood and neck pain following a motor vehicle accident when she sustained a whiplash injury. She stated her back pain radiated into her hips and thigh. Dr. McMillan noted the plaintiff had no frank sciatica symptoms, and her back pain complaints were much greater than her leg pain complaints. He noted she used a cane for ambulation during severe

12

episodes.  The plaintiff told Dr. McMillan she had depression and bipolar disorder for which she received "medical disability" and she underwent lidocaine infusion therapy with negative results.  Dr. McMillan found the plaintiff had significantly concordant distal lumbar spinal tenderness to deep palpation bilaterally, right greater than the left, exacerbated by hyperextension of the hip.  She had normal motor functioning, sensation, and reflexes in her lower extremities.  Her straight leg raising was remarkable for back pain only in the absence of radicular symptoms. Dr. McMillan recommended lumbar facet block injections (Tr. 783-85).

On August 4, 2009, the plaintiff underwent bilateral lumbar facet block injections and an epidural steroid injection in her low back (Tr. 782).  On August 26, 2009, she reported no benefit from these injections (Tr. 781).  On September 1, 2009, the plaintiff underwent a diagnostic lumbar discogram, which showed concordant axial lumbar spinal pain and right gluteal pain symptoms reproduced with disc pressurization at L4-5 and L5-S1 and negative pressure controlled diagnostic lumbar discography at L3-4 (Tr. 779-80). The plaintiff underwent percutaneous laser discectomy surgery on September 17, 2009, by Dr. McMillan (Tr. 778).

On September 21, 2009, the plaintiff presented to the Oconee Medical Center emergency room with complaints of worsening back pain since her discectomy.  Bill Chiles, M.D., found she was in no distress and had normal sensation and motor strength in her lower extremities and symmetric reflexes in her knees and ankles.  He instructed the plaintiff to contact her pain physician the following morning (Tr. 944-45).  The following day, the plaintiff underwent lumbar facet injections by Dr. McMillan (Tr. 777).  On October 8, 2009, the plaintiff underwent right lumbar facet rhizotomy at L3, L4, and L5 (Tr. 776).

On October 15, 2009, Dr. Baxley diagnosed the plaintiff with left ulnar neuropathy not related to her surgery, intractable low back pain, and mechanical neck pain (Tr. 856-57).  On October 23, 2009, the plaintiff presented to the Oconee Medical Center

13

emergency room with complaints of chest pain and feeling like she was passing out because she was upset after learning her husband cheated on her. Roshan Mathew, M.D., noted that the plaintiff was surrounded by family members and "actively, continuously texted on her Blackberry" and "ha[d] to be interrupted to make eye contact and give her history of symptoms." She was alert and oriented and answered questions appropriately. Dr. Mathew diagnosed stress reaction and prescribed Valium and Ambien (Tr. 932-39).

On November 9, 2009, the plaintiff returned to the Oconee Medical Center emergency room with complaints of back pain. She reported having laser disc surgery that "did not work" and severe lower back pain that increased with movement and radiated into her legs. She reported she smoked a pack of cigarettes daily. Dr. Chiles found she was obese, reading a book, and appeared comfortable at rest. Upon examination, she moved very slowly and was visibly uncomfortable. Dr. Chiles found she had normal strength in her lower extremities and sensation in her feet; could toe walk, heel walk, and squat; and had symmetric reflexes in her knees and ankles. Dr. Chiles prescribed Motrin and Flexeril (Tr. 925-27).

On November 18, 2009, the plaintiff returned to the Oconee Medical Center emergency room with complaints of chest pain after receiving a series of harassing phone calls and text messages from her husband. Dr. Chiles found she had normal respiratory and cardiovascular functioning. The plaintiff underwent an echocardiogram and chest x-ray, which were normal. The plaintiff then stated her pain subsided and that she wanted to go home. Dr. Chiles recommended further monitoring; however, the plaintiff left against medical advice (Tr. 896, 915-18).

On November 28, 2009, the plaintiff again presented to the Oconee Medical Center emergency room stating that she "want[ed] to kill [her]self." She stated that, a month prior, her husband left her for another woman. She stated she had thoughts of killing herself, but no plan. However, she stated that, if she had a gun, she would "blow her head

off." She stated she attempted suicide twice in the past. David Heape, M.D., found the plaintiff had a relatively flat affect, but was oriented and cooperative, and denied hallucinations (Tr. 905-06). Upon further evaluation, she reported she had bipolar disorder, managed by her family doctor. She stated her mood was stable, with emotional swings related to her relationship with her husband. She stated she had an overdose as a teenager, but made no suicide attempts since. She had a normal mental status examination. She agreed to seek marriage counseling (Tr. 908-14).

In December 2009, the plaintiff told Ms. Meyers in Dr. Campbell's office that she smoked a pack of cigarettes per day for 28 years (Tr. 795-96). In February 2010, Ms. Butts stated that the plaintiff was overweight and diagnosed hypertension and anxiety. She prescribed medications, including Klonopin and Prozac, and recommended weight loss (Tr. 793-94). In April 2010, the plaintiff received trigger point injections from Dr. Baxley (Tr. 852-53). The following month, the plaintiff underwent a lumbar MRI study that showed central and left of center disc protrusion at L5-S1, which might touch upon the traversing left-sided S1 nerve root; degenerative disc disease at L5-S1; and facet joint arthritic changes (Tr. 894).

In January 2011, the plaintiff returned to Ms. Butts with complaints of back pain and weight gain (Tr. 786, 788-89). In March 2011, the plaintiff presented to Dr. Baxley with complaints of a "significant amount of pain from her fibromyalgia." Dr. Baxley found she was in a "mild to moderate amount of discomfort." She had normal reflexes and 4+/5 strength. She had multiple positive trigger points in her neck, shoulders, back, arms, and lower extremities. Dr. Baxley administered trigger point injections to the plaintiff's bilateral trapezius, rhomboid, and lumbar areas. He prescribed medications and recommended daily stretching, strengthening exercises, and walking (Tr. 844-45).

In May 2011, the plaintiff underwent trigger point injections to her bilateral trapezius and lumbar areas (Tr. 842-43). She told Dr. Baxley in June 2011 that her trigger

point injections were helpful for about four weeks or so, but she was beginning to have some increased pain in the left trapezius and right hip.  She stated she continued to have a "significant amount of discomfort in trigger points from fibromyalgia and complained of left carpal tunnel syndrome."  Dr. Baxley found the plaintiff had various positive trigger points in her left trapezius and right hip and administered trigger point injections and encouraged physical activity (Tr. 840-41).

On June 24, 2011, the plaintiff presented to the emergency room, reporting that she fell the prior day.  She stated she went to urgent care and "[t]hey said [she] pulled the ligaments in [her] right ankle."  But, "[she was] in such severe pain that [she could] hardly even stand [a] brace they gave [her]."  Billy Hutcheson, R.N., noted that the plaintiff was "cussing, saying the 'F' word with any touch of the tender area in front of her young child," and the physician "[r]equested that [the] young child be removed from [the] room for further examination."  Nurse Hutcheson informed the plaintiff that her adult and minor children needed to leave per the physician's request, but the plaintiff was "adamant against the removal of the minor child, and stated 'it was none of his business what [she] sa[id] in front of [her] child.  [She could] say what [she] want[ed] to.'"  When Nurse Hutcheson informed the plaintiff of the policy that nurses could limit or bar visitors, the plaintiff stated she was "leaving and [would] be filing a complaint."  The plaintiff left the emergency room without further evaluation or treatment (Tr. 877-78).

On August 2, 2011, the plaintiff told Dr. Baxley that trigger point injections "work[ed] quite well for her" and "last[ed] several weeks."  She also noticed "a decreased burning sensation in her shoulders after her trigger points," but "some increased popping sensation and tightness in her cervical region."  Dr. Baxley administered trigger point injections to the plaintiff's trapezius and right lumbar region (Tr. 838-39).  Dr. Baxley continued to administer trigger point injections through November 2011 (Tr. 832-37).

16

On January 3, 2012, Stuart Barnes, M.D., performed an orthopedic examination of the plaintiff at the request of the state agency. The plaintiff complained that she tended to fall, especially when she went up or down stairs. She reported she had "been depressed all her life" and her depression was "helped slightly" with medications. Dr. Barnes found she "crie[d] a lot" and "appear[ed] sad," but had normal communication skills. Dr. Barnes found the plaintiff used no assistive device. She had normal standing posture and was obese. Dr. Barnes found the plaintiff had normal range of motion in her arms and legs. She complained of decreased sensation in the ulnar distribution, but Dr. Barnes "check[ed] no significant problems." She had 4/5 strength in all major muscle groups of the upper extremities. She had decreased grip strength with maximum grip of 70 pounds in the right hand and 11 pounds with the left. She had "difficult to determine" strength and "tend[ed] to fall easily and depend[ed] on her daughter for balance." She stated she was unable to squat because she would not be able to get back up.

Dr. Barnes found she had no major sensory deficits and normal fine dexterity, rapid alternating movements, and finger-to-nose testing. On Romberg testing (test to determine coordination), she tended to fall right or left. She could not heel, toe, or tandem walk or balance on either leg without holding onto something for fear of falling. She had diminished to normal reflexes throughout. She had normal ranges of motion in her cervical spine. She refused to try and touch her toes, stating that it "hurt too much." She could straight leg raise to about 80 degrees bilaterally and had positive Waddell's signs (test used to determine malingering) for hypersensitivity, axial loading, spinal rotation, and distraction. Dr. Barnes diagnosed severe depression and fibromyalgia. Dr. Barnes stated that he would "defer detailed mental status exam to psychologist" and noted that the plaintiff had a psychiatric evaluation scheduled for later in the week. However, in his comments, Dr. Barnes stated that the plaintiff was "going to need major psychiatric intervention," and "[a]t this time, she will be unable to perform any useful occupation" (Tr. 863-66).

17

In a Medical Source Statement of Ability To Do Work-Related Activities (Physical), Dr. Barnes stated that the plaintiff could lift and carry up to ten pounds frequently and up to 20 pounds occasionally. He stated she could sit for five hours at one time and stand/walk for 30 minutes each at one time. He stated the plaintiff could sit for six hours, stand for one hour, and walk for one hour each in an eight-hour workday. She did not require a cane to ambulate, and she could occasionally reach, handle, finger, feel, push, and pull. The doctor stated she could never climb ladders or scaffolds, balance, or crawl, but could occasionally climb stairs and ramps, stoop, kneel, and crouch. He stated she could never operate a motor vehicle or be exposed to unprotected heights, moving machinery, or temperature extremes, but could occasionally tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibrations, and these limitations were present since January 2011 (Tr. 870-75).

On January 5, 2012, Brian Keith, Ph.D., a licensed counseling psychologist, performed a psychological evaluation of the plaintiff at the request of the state agency. The plaintiff stated she did not receive counseling or therapy. She stated that she watched television, read, took hot baths, and stayed in bed. She needed assistance meeting hygiene needs. She stated her older daughter prepared her meals, washed the dishes and laundry, and shopped for groceries. She smoked two packs of cigarettes per day that her daughter purchased for her and occasionally attended church. She stated she did not get along with other people and "hate[d] men" (Tr. 950-51).

When asked if she knew her approximate weight, the plaintiff responded by stating "that is none of your business." She was unable to identify the day of the week or the month. She had poor eye contact, and her affect fluctuated throughout the evaluation. When asked to identify her mood, she stated she "[did not] have one" and "just want[ed] to die." She had normal psychomotor functioning and clear speech. Overall, the plaintiff had an agitated demeanor, but was alert and attentive. She was coherent and at times "a bit

18

circumstantial" in her dialogue.  She stated she had frequent suicidal thoughts.  She denied visual hallucinations, but endorsed auditory hallucinations of "people talking."  She stated she had no energy, "up and down" appetite, and difficulty sleeping.  She could not work because she got "real angry" and "t[ore] things up. "She stated she "[did not] like being told what to do" and "ha[d] a bad temper" (Tr. 951-52).

During IQ testing, Dr. Keith noted that, several times throughout the test, the plaintiff stopped and frequently stated she was "not going to do any more of this, [and she was] tired."  During achievement testing, the plaintiff stated she "[did not] want to read anymore, [and was] just not going to do it."  She also stated she was "tired, [and was] not going to read anymore."  She completed 25 math computations, but then refused to take any additional problems.  Dr. Keith diagnosed possible bipolar and borderline personality disorders. Dr. Keith stated that, "[o]verall, [the plaintiff's] cognitive skills appear[ed] sufficient for engaging in various work activities for which she was previously employed.  She reported she worked as a cashier and d[id] appear to have cognitive skills sufficient for that activity."  He stated the plaintiff's emotional level "may impact her ability to interact with others" and "may interfere with her ability to concentrate" (Tr. 950-56).  In his Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Keith stated the plaintiff had no or only "mild" work-related mental limitations (Tr. 957-59).

***Other Evidence and the Plaintiff's Hearing Testimony***

In a November 2007 function report, the plaintiff stated that she took care of her child, including feeding, bathing, dressing her, and changing her diapers.  She stated she cleaned and washed laundry with the assistance of her older daughter.  She stated she went outside once a day and drove and rode in cars.  She stated she shopped for groceries at the store once a month (Tr. 148-55).  In a February 2008 function report, she stated she cared for her nine-month-old daughter with assistance from her older daughter, went outside and shopped for diapers and wipes at the store once a week, and rode in cars (Tr.

188-95).  In December 2011, she stated she could not attend a consultative examination because she had no one to care for her invalid father (Tr. 770).

At the August 2012 hearing, the plaintiff testified she attended to an elderly couple in 2009, but just sat there and did no household chores or cleaning.  She earned $4,618.00 for this, reporting it as self-employment income for 2009 (Tr. 612).  She stated she lived with her 25-year-old daughter who worked to pay the bills (Tr. 610).  She testified she had a driver's license, but her daughter drove her most of the time (Tr. 611).  She testified her daughter performed all household chores and also worked at a retail store and was training to become an assistant manager (Tr. 627-28).  She testified that back injections helped, but some days she could hardly walk into to the room to undergo these injections her pain was so bad (Tr. 618).  She stated walking was painful, she experienced pain and numbness in her left arm and fingers, and she had no grip with either hand (Tr. 620).  She testified she sprained her ankle the prior year and then twisted it again and that it "w[ould] never get [any] better" (Tr. 624).  She stated her medication made her drowsy and she tried to nap during the day because she could not sleep at night (Tr. 626-27).  She claimed her daughter had to get her in and out of bed and she was unable to wash her hair or bathe without assistance (Tr. 628-29).  She testified she was not undergoing any mental health treatment at that time (Tr. 625).

## ANALYSIS

The plaintiff alleges disability commencing June 15, 2006, at which time she was 37 years old.  She was 43 years old on the date the ALJ issued his decision.  The ALJ determined that the plaintiff had the residual functional capacity ("RFC") to perform a range of sedentary work.  The plaintiff argues that the ALJ erred by (1) substituting his own lay opinion of her RFC for the opinions of state agency evaluators and treating physicians; (2) failing to properly evaluate the opinion of her treating physician, Dr. Baxley; and (3) questioning her credibility without proper development of the record.  Additionally, the

20

plaintiff argues that the court should consider an MRI study and x-rays performed in May 2013.

### Residual Functional Capacity

The plaintiff first argues that the ALJ erred in substituting his own opinion of her RFC for the opinions fo the state agency evaluators and the treating physicians. Social Security Ruling ("SSR") 96-8p provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

1996 WL 374184, at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.* Furthermore, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The ALJ found that the plaintiff had the RFC to perform a range of sedentary work. Specifically, he found that the plaintiff could lift/carry, push/pull ten pounds occasionally, less than ten pounds frequently, sit about six out of eight hours, and stand/walk about two out of eight hours. He further found that she could occasionally climb ropes/ladders/scaffolds and frequently perform all other postural activities and should avoid concentrated exposure to hazards; she could concentrate, persist, and work at pace to do

simple, routine, repetitive tasks at one and two step instructions for two-hour periods in an eight-hour day; and she could interact occasionally with the public and interact appropriately with co-workers and supervisors in a stable routine setting (Tr. 558).

Substantial evidence supports the ALJ's RFC assessment with regard to the plaintiff's physical impairments. When the plaintiff was seen in Dr. Campbell's office in June 2006, the month she alleges her disability began, the examination revealed her cervical, thoracic, and lumbar spines had no abnormal curvatures or tenderness and full range of motion; her sacroiliac joint showed full range of motion without point tenderness; her upper and lower extremity joints were normal; and her neurological system was normal with good muscular coordination and strength and no sensory deficits. No diagnoses and no treatment recommendations were made (Tr. 229-31). In November 2006, Ms. Speer found the plaintiff had no tenderness and full ranges of motion in her shoulders, elbows, hands, fingers, hips, knees, and ankles. She had good muscular coordination and strength bilaterally with no gross sensory deficits (Tr. 224-27).

As noted by the ALJ (Tr. 545-46), the plaintiff first complained of musculoskeletal impairments when she saw Dr. Sherrill in October 2007. Dr. Sherrill found that while the plaintiff had questionably positive straight leg raising tests bilaterally, weakness and suppressed sensation in her left leg, and abnormal left ankle reflex, her remaining reflexes and sensation were normal, and she had good fine motor activity, no fasciculations or atrophy, and a "slightly" antalgic gait (Tr. 334-36). A lower extremity EMG/NCV study was fairly normal with no sign of left tibial mononeuropathy, plexopathy, myopathy, peripheral neuropathy, or radiculopathy (Tr. 327-31). The following month, a lumbar spine MRI study showed disc desiccation, but only "mild" central disc protrusion at L5-S1 closely approximating the left S1 nerve root and no other abnormalities (Tr. 322).

In January 2008, while Dr. Agha found the plaintiff had painful fibromyalgia tender points and neck and low back tenderness, she had no swelling and intact mobility

in her wrists, hands, and fingers; normal elbows and shoulders; negative straight leg raising tests; and good hip ranges of motion (Tr. 361-62). In March 2008, while Dr. Agha noted arthralgia and muscle tenderness, he noted no morning stiffness, joint swelling, decreased activities in daily living, sleep change, numbness, neck pain, low back pain, night pain, gouty episodes, or radicular pain. The plaintiff also had no nodules, synovitis, or osteoarthritis symptoms (Tr. 477). Dr. Agha made similar findings in July 2008 (Tr. 476). The plaintiff requested a handicapped placard that same month, but Dr. Campbell's physician's assistant refused and instructed her to get more exercise (Tr. 510-13). The following month, a physician's assistant in the Oconee Medical Center emergency room found that, while the plaintiff had lumbar, sciatic, and right leg pain and a positive straight leg raising test on the left, she had full range of motion in her extremities, normal reflexes and gait, intact sensation, and no difficulty walking (Tr. 486-88).

In October 2008, Dr. Baxley found the plaintiff had normal reflexes, 4+/5 strength in her extremities, intact sensation and gait, and no lumbar tenderness or extremity cyanosis or edema (Tr. 524-25). Two months later, while Dr. Tebalt found the plaintiff had some diminished reflexes and pain in her back, shoulders, and upper arms, she had full ranges of motion in her shoulders, normal triceps and Achilles reflexes, full ranges of motion in her hips, knees, and ankles, and no palpable muscle spasms in her back or lower extremity atrophy (Tr. 498-500).

In January 2009, the plaintiff complained of severe pain, and, upon physical examination, Dr. Baxley found the plaintiff had numerous tender points on palpation on back, upper, and lower extremities. Dr. Baxley advised the plaintiff to increase her physical activity of walking ten to 15 minutes out and ten to 15 minutes back on a daily basis and to increase her time as tolerated (Tr. 518-19). In April 2009, Dr. Baxley found the plaintiff had normal reflexes, full strength in her upper and lower extremities, and intact sensation and gait (Tr. 516-17). The following month, while the plaintiff had left ankle and right hip

23

tenderness, she had full ranges of motion in all of her extremities (Tr. 948-49). In July 2009, Dr. Baxley found that the plaintiff was tender from her cervical to her lumbar spine; however, he also found she had normal reflexes and strength (Tr. 858, 860).

In August 2009, Dr. McMillan found that the plaintiff had normal motor functioning, sensation, and reflexes in her lower extremities and a positive straight leg raising test only in the absence of radicular symptoms (Tr. 783-85).  In September 2009, Dr. Chiles found that the plaintiff had normal sensation and motor strength in her lower extremities and symmetric reflexes in her knees and ankles (Tr. 944-45).  On November 9, 2009, Dr. Chiles found that, while the plaintiff moved very slowly and was visibly uncomfortable, she had normal strength in her lower extremities and sensation in her feet; could toe walk, heel walk, and squat; and had symmetric reflexes in her knees and ankles (Tr. 925-27).

In March 2011, Dr. Baxley found that, while the plaintiff was in "mild-to-moderate" discomfort and had multiple positive trigger points, she had normal reflexes and 4+/5 strength (Tr. 844-45).  In January 2012, Dr. Barnes found the plaintiff used no assistive device; had 4/5 strength in all major muscle groups of the upper extremities; could do straight leg raising to about 80 degrees bilaterally; and had no major sensory deficits.  She had normal fine dexterity, rapid alternating movements, and finger to nose testing, and normal ranges of motion in her cervical spine, shoulders (passively), elbows, wrists, thumbs, digits of the hands, hips, knees, and ankles (Tr. 863-66).  Dr. Barnes opined that the plaintiff could lift and carry up to ten pounds frequently and lift 20 pounds occasionally; sit for six hours, stand for one hour, and walk for one hour each in an eight-hour workday; did not require a cane to ambulate; could occasionally reach, handle, finger feel, push, pull, climb stairs/ramps, stoop, kneel, crouch and tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibrations (Tr. 870-75).

Substantial evidence also supports the ALJ's RFC assessment with regard to the plaintiff's mental impairments. The ALJ found that the plaintiff could concentrate, persist, and work at pace to do simple, routine, repetitive tasks at one and two step instructions for two-hour periods in an eight-hour day; she could interact occasionally with the public and interact appropriately with co-workers and supervisors in a stable routine setting (Tr. 558).

In November 2006, Ms. Speer found that the plaintiff was alert and cooperative (Tr. 224-27). In December 2007, a physician's assistant in Dr. Campbell's office, Ms. Meyers, stated that the plaintiff was oriented and had intact thought processes, appropriate thought content, normal mood and affect, and good attention, concentration, and memory. Prozac had been prescribed, which helped the plaintiff. Ms. Meyers indicated the plaintiff was diagnosed with depression, which resulted in no work-related limitations (Tr. 342). On April 2, 2008, Dr. Campbell's nurse completed a form indicating that the plaintiff was diagnosed with depression, her attention and concentration were good, she did not exhibit any work-related limitations in functioning due to her mental impairment, and she was not severely depressed (Tr. 380). On November 28, 2009, Dr. Heape found that, while the plaintiff had a relatively flat affect, she was oriented, cooperative, and in no distress and denied hallucinations (Tr. 905-06).

In January 2012, Dr. Keith found that the plaintiff was unable to identify the day of the week or the month. She also had poor eye contact, and her affect fluctuated. She stated she had no mood and "just want[ed] to die." She had an agitated demeanor, some circumstantial dialogue, and stated she had frequent suicidal thoughts, auditory hallucinations, variable appetite, difficulty sleeping, and no energy. However, she was alert, attentive, and coherent; had normal psychomotor functioning and clear speech; and denied visual hallucinations (Tr. 950-56). Dr. Keith stated that the plaintiff had no or only "mild" work-related mental limitations (Tr. 957-59).

25

Based upon the foregoing, the undersigned finds that the ALJ's RFC assessment was based upon substantial evidence.  Moreover, as will be discussed below, the ALJ properly considered and addressed the plaintiff's credibility and the medical source opinions in the RFC assessment.

### *Treating Physician*

The plaintiff next argues that the ALJ failed to properly consider the opinion of Dr. Baxley.  The regulations require that all medical opinions in a case be considered, 20 C.F.R. §§ 404.1527(b), 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list:  (1)  the examining relationship;  (2)   the length of the treatment relationship and the frequency of the examinations; (3)  the nature and extent of the treatment relationship; (4)  the evidence with which the physician supports his opinion; (5)   the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. §§ 404.1527(c)(1)-(5), 416.927(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005).  However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions.  These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5.  As stated in SSR 96-2p:

26

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

On May 19, 2009, Dr. Baxley stated that the plaintiff's pain was "[p]rofound and intractable; [and] virtually incapacitated [her]." He stated that physical activity such as walking, standing, bending, stooping, and moving her extremities increased her pain "[t]o such a degree as to require increased medication from pain or substantial amounts of bed rest." He stated that the plaintiff's pain "[r]ender[ed her] unable to function at a productive work level" with respect to her ability to perform her previous work. He stated the plaintiff's medications "[l]imit[ed] the effectiveness of work duties or the performance of such everyday tasks such as driving an automobile, etc." He stated that the plaintiff's medications "[l]imited effectiveness due to distraction, inattentiveness, and drowsiness, etc.," with respect to her ability to perform her previous work activities. He stated that, the plaintiff's "[p]ain should diminish to an insignificant level in time, but m[ight] still be present" and that medications and other treatment had "been used successfully in cases like this one." He stated the plaintiff sometimes needed unscheduled breaks every two to three hours for 15 minutes in a workday and she would miss about three days of work per month (Tr. 526-27).

The ALJ considered Dr. Baxley's opinion and found that the opinion was not well-supported by medically acceptable clinical and laboratory diagnostic techniques, was inconsistent with other evidence in the record, and was internally inconsistent (Tr. 564-65). The ALJ noted (Tr. 564) that while Dr. Baxley stated the plaintiff's pain was profound,

27

intractable, incapacitating, and rendered her unable to function at a productive work level, he also stated that, while medication would limit activities such as driving, it would not severely limit her ability to perform the simplest tasks or render her unable to function at a productive work level (Tr. 526). Dr. Baxley also did not state that pain would remain a significant element of the plaintiff's life and did not state that little improvement was likely or that her pain would increase with time. He also stated that treatment had been successful in cases like the plaintiff's in the past (Tr. 527). As the ALJ found, Dr. Baxley's opinion was inconsistent with his own treatment records (Tr. 516-17, 524-25, 844-45, 858, 860), discussed above, and Dr. Baxley's opinion was inconsistent with the other medical evidence of record, including the findings of Drs. Sherrill (Tr. 334-36), Agha (Tr. 361-62, 476-77), Tebalt (Tr. 498-500), McMillan (Tr. 783-85), Chiles (Tr. 925-27, 944-45), Heape (Tr. 905-06), Barnes (Tr. 863-66), and Keith (Tr. 950-56), discussed above. Furthermore, as the ALJ noted, at the time Dr. Baxley rendered his opinion, he had only treated the plaintiff for seven months (Tr. 565).

The plaintiff further argues that the ALJ "had the duty to reconcile these discrepancies by questioning Dr. Baxley, either at the hearing or via interrogatories, neither of which was done" (pl. brief at p. 5). Notably, as discussed above, the agency subpoenaed Dr. Baxley for the hearing, but he did not appear (Tr. 607-08, 737-38, 744-46).

The plaintiff next argues the ALJ erred by improperly considering the opinions of Dr. Barnes (pl. brief at pp. 8-10), a non-treating, examining physician. On January 3, 2012, Dr. Barnes performed an orthopedic examination of the plaintiff at the request of the state agency. Dr. Barnes stated that he would "defer detailed mental status exam to psychologist" and noted that the plaintiff had a psychiatric evaluation scheduled for later in the week. However, in his comments, Dr. Barnes stated that the plaintiff was "going to need major psychiatric intervention," and "[a]t this time, she will be unable to perform any useful occupation" (Tr. 863-66). In a Medical Source Statement of Ability To Do Work-Related

28

Activities (Physical), Dr. Barnes stated that the plaintiff could lift and carry up to ten pounds frequently and up to 20 pounds occasionally.  He stated she could sit for five hours at one time and stand/walk for 30 minutes each at one time.  He stated the plaintiff could sit for six hours, stand for one hour, and walk for one hour each in an eight-hour workday.  She did not require a cane to ambulate, and she could occasionally reach, handle, finger, feel, push, and pull.  He  stated she could never climb ladders or scaffolds, balance, or crawl, but could occasionally climb stairs and ramps, stoop, kneel, and crouch.  He stated she could never operate a motor vehicle or be exposed to unprotected heights, moving machinery, or temperature extremes, but could occasionally tolerate exposure to humidity, wetness, dust, odors, fumes, pulmonary irritants, and vibrations, and these limitations were present since January 2011 (Tr. 870-75).

The ALJ found that Dr. Barnes's opinion was entitled to "significant weight" only with respect to walking, standing, and sitting and that she did not need an assistive device, noting that "[s]uch limitations [were] consistent with the record and with a finding that she [was] limited to sedentary exertion" (Tr. 565).  The ALJ found that the remainder of Dr. Barnes's opinion was entitled to "little weight."  Based on the plaintiff's obesity and back impairment, the ALJ found the plaintiff was more limited than Dr. Barnes stated with respect to climbing and lifting (Tr. 565).  The ALJ further found that the plaintiff had no impairment affecting her feet or upper extremities, and thus she had no limitations for pushing and pulling with the lower extremities or for manipulative activities (Tr. 565-66).  The ALJ further found that the medical evidence did not support the degree of limitation described by Dr. Barnes for all other postural activities or environmental limitations (Tr. 566).

With respect to Dr. Barnes' statement that the plaintiff was "[a]t this time[,] . . . unable to perform any useful occupation" (Tr. 866), as the ALJ found, this was not a medical opinion at all, but an administrative finding reserved to the Commissioner (Tr. 566).  *See* 20 C.F.R. §§ 404.1527(d)(1)-(3), 416.927(d)(1)-(3) (treating source opinions on issues

that are reserved to the Commissioner are never entitled to any special significance); SSR 96-5p, 1996 WL 374183, at *5. Moreover as the ALJ found (Tr. 566), this statement was inconsistent with Dr. Barnes's own findings on examination as set forth in his Medical Source Statement of Ability To Do Work-Related Activities (Physical) (Tr. 863-66). Furthermore, Dr. Barnes provided no basis for his opinion.  Immediately prior this statement, Dr. Barnes commented that the plaintiff was "going to need major psychiatric intervention" (Tr.866).  To the extent that Dr. Barnes' statement that the plaintiff was "unable to perform any useful occupation" was related to his opinion that the plaintiff needed psychiatric intervention, it is important to note that Dr. Barnes performed an orthopedic examination and is not a psychiatrist or psychologist, as he noted himself in the report (Tr. 864 (stating, "I will defer detailed mental status exam to psychologist.")).

The plaintiff further argues that the ALJ erred by improperly considering the opinion of Dr. Keith (pl. brief at pp. 8-9), who was also a non-treating, examining physician. Dr. Keith,a licensed counseling psychologist, performed a psychological evaluation of the plaintiff at the request of the state agency in January 2012. Dr. Keith stated that, "[o]verall, [the plaintiff's] cognitive skills appear[ed] sufficient for engaging in various work activities for which she was previously employed.  She reported she worked as a cashier and d[id] appear to have cognitive skills sufficient for that activity."  He further stated the plaintiff's emotional level "may impact her ability to interact with others" and "may interfere with her ability to concentrate" (Tr. 950-56).  In his Medical Source Statement of Ability to Do Work-Related Activities (Mental), Dr. Keith stated the plaintiff had no or only "mild" work-related mental limitations (Tr. 957-59).

Dr. Keith stated that the plaintiff had only a "mild" limitation on her ability to understand and remember simple instructions, and no limitation on her ability to carry them out and in all areas related to ability to interact appropriately with supervisors, co-workers, and the public and respond to changes in a work setting (Tr. 957-59).  The ALJ assigned

"significant weight" to this portion of the opinion, noting that Dr. Keith's examination findings and other evidence supported these conclusions (Tr. 566).  However, the ALJ assigned "little weight" to Dr. Keith's opinion that the plaintiff had only "mild" limitation in her ability to understand, remember, and carry out complex instructions and interact with the public as "[e]vidence of moderate limitation of social functioning and of concentration, persistence[,] or pace supports a more significant limitation in those areas" (Tr. 566).  With respect to Dr. Keith's statement that the plaintiff's "cognitive skills appear[ed] sufficient for engaging in various work activities for which she was previously employed" and she "worked as a cashier and d[id] appear to have cognitive skills sufficient for that activity" (Tr. 950-56), the ALJ properly found this was not a medical opinion, but rather was an administrative finding reserved to the Commissioner (Tr. 566).

The plaintiff also argues that the ALJ erred by improperly evaluating the opinions of Dr. Campbell (pl. brief at pp. 8-9).  In December 2007, a physician's assistant in Dr. Campbell's office, Ms. Meyers, stated that the plaintiff was oriented and had intact thought processes, appropriate thought content, normal mood and affect, and good attention, concentration, and memory.  Prozac had been prescribed, which helped the plaintiff.  Ms. Meyers indicated the plaintiff was diagnosed with depression, which resulted in no work-related limitations (Tr. 342).  On April 2, 2008, Dr. Campbell's nurse completed a form indicating that the plaintiff was diagnosed with depression, her attention and concentration were good, she did not exhibit any work-related limitations in functioning due to her mental impairment, and she was not severely depressed (Tr. 380).

The ALJ characterized the statements as "medical opinions" from Dr. Campbell (Tr. 565).  As an initial matter, as argued by the Commissioner, Ms. Meyers and Ms. Butts were not "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, and licensed podiatrists. *See* 20 C.F.R. §§ 404.1502, 404.1513(a).  The regulations define physician's assistants and nurse

practitioners as "other sources" rather than acceptable medical sources. *Id*. §
404.1513(d)(1). Nonetheless, the ALJ engaged in the same analysis that he would have
otherwise (Tr. 565). *See* SSR 06-03p, 2006 WL 2329939, at *4-5 (stating that the factors
set forth in the regulations for evaluating medical opinions from "acceptable medical
sources" can be applied to opinion evidence from other "other medical sources). As the ALJ
found, the statements of Ms. Meyers and Ms. Butts that the plaintiff had no work-related
mental limitations were "not supported by the entire record and [were] not consistent with
Dr. Keith's findings or those in [the state agency physician] opinions." Thus, as the ALJ
found, the statements were entitled to only "little weight" as they were an underestimate of
the plaintiff's limitations from anxiety and depression (Tr. 565).

      The plaintiff argues that, because the ALJ discounted the opinions of Drs.
Baxley and Barnes and the statements of Ms. Meyers and Ms. Butts in some manner, he
had no medical opinion upon which to base his RFC findings (pl. brief at pp. 7-13).
However, as argued by the Commissioner, the agency's regulations make it clear that it is
the ALJ's responsibility to assess a claimant's RFC. *See* 20 C.F.R. § 404.1546 (at the
administrative hearing level, the ALJ is responsible for assessing RFC); SSR 96-5p, 1996
WL 374183, at *2, 4-5 (the ALJ has the responsibility for determining RFC). Notably, the
determination of a claimant's RFC can often be "dispositive" of the claimant's disability
status. 20 C.F.R. § 404.1527(d)(2); SSR 96-5p, 1996 WL 374183, at *2. For this reason,
RFC assessments "must be based on all the evidence in the case record," not just the
medical evidence. *See* SSR 96-8p, 1996 WL 374184, at *5; 20 C.F.R. § 404.1545(a). As
such, no doctor's opinion is alone conclusive on this issue. SSR 96-5p, 1996 WL 374183,
at *2 ("some issues [such as RFC assessments] are not medical issues regarding the nature
and severity of an individual's impairment(s) but are administrative findings" and "the
regulations provide that the final responsibility for deciding issues such as these are
reserved to the Commissioner.").

Based upon the foregoing, the undersigned finds that the ALJ properly considered the opinion evidence, and his findings are based upon substantial evidence and are free from legal error.

***Credibility***

The plaintiff next argues that the ALJ failed to properly evaluate her credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

The court further acknowledged:

> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on

credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)    the individual's daily activities;

(2)    the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)    factors that precipitate and aggravate the symptoms;

(4)    the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)    treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)    any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)    any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.  *See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 563).  In his analysis of the plaintiff's credibility, the ALJ found that the plaintiff's activities of daily living were inconsistent with the degree of symptomology and limitation that she alleged (Tr. 561).  In November 2007, the plaintiff stated she took care of her child, including feeding, bathing,

35

dressing her, and changing her diapers.  She also stated she cleaned and washed laundry with assistance.  She stated she went outside once a day and drove and rode in cars.  She stated she shopped for groceries at the store once a month (Tr. 148-55).  In February 2008, she stated she cared for her nine-month-old daughter with assistance from her daughter, shopped for diapers and wipes at the store once a week, and rode in cars (Tr. 188-95).  In December 2011, she stated she could not attend a consultative examination because she had no one to care for her invalid father (Tr. 770), which the ALJ noted was further evidence that the plaintiff has been a caregiver for other family members (Tr. 561).  In January 2012, she told Dr. Keith her activities included watching television, reading, taking hot baths, and attending church occasionally (Tr. 950-56).  At the hearing, the plaintiff testified that her daughter did all the household chores and had to help her in and out of the bed and the tub.  However, she further testified that her daughter worked at a retail store and was training to become an assistant manager (Tr. 627-29), which, as the ALJ noted, supported an inference that the plaintiff engaged in more childcare and household chores than she alleged (Tr. 561).

The ALJ further found that the plaintiff's work activity following her alleged onset date also detracted from her credibility (Tr. 561). The plaintiff attended to an elderly couple in 2009. She earned $4,618.00 for this, reporting it as self-employment income (Tr. 612). *See* 20 C.F.R. § 404.1571 ("Even if the work you have done [during a period of claimed disability] was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

The ALJ also noted that the evidence that the plaintiff's impairments were improved by medications or other treatment also undermined the credibility of her subjective complaints (Tr. 562). In June 2007, Ms. Meyers noted that Prozac controlled the plaintiff's symptoms very well (Tr. 221-23). In April 2008, Ms. Butts noted that the plaintiff's depression was helped by Prozac (Tr. 380).  In February 2009, the plaintiff reported that a

lidocaine infusion provided "excellent relief" for about three days and "[was] extremely beneficial to her" (Tr. 495). The following month, she acknowledged that a lidocaine infusion helped "10 [percent] for just a few days" (Tr. 494). In April 2009, the plaintiff told Dr. Baxley that a lidocaine infusion helped her for several days (Tr. 516-17). The following July, the plaintiff stated trigger point injections seemed to help her pain (Tr. 858, 860). In May 2011, the plaintiff told Dr. Baxley that trigger point injections helped for about four weeks or so (Tr. 840-41). In August 2011, she stated trigger point injections "work[ed] quite well for her" and "last[ed] several weeks" (Tr. 838-39).

Furthermore, as the ALJ found, the plaintiff's lack of treatment for her allegedly disabling impairments supported a finding that her subjective complaints were not fully credible (Tr. 562-63). The plaintiff told Dr. Keith in January 2012 that she did not receive any counseling or therapy (Tr. 950-56), and she testified at the hearing that she was not undergoing any mental health treatment. She testified that her family doctor gave her medicine for depression, which helped her (Tr. 625).

Moreover, as the ALJ also found, the plaintiff's failure to cooperate at the consultative examinations underscored her lack of credibility (Tr. 562-63). When Dr. Barnes asked the plaintiff to touch her toes, she refused, stating that it "hurt too much" (Tr. 863-66). When Dr. Keith asked the plaintiff if she knew her weight, she told him that was "none of [his] business." Further, when Dr. Keith administered the WAIS-IV, the plaintiff simply stopped and frequently stated she was "not going to do any more of this, [and she was] tired." During the WRAT-IV, she stated she was "[did not] want to read anymore, [and was] just not going to do it." She completed 25 math problems, but then refused to take any additional problems (Tr. 950-56).

As the ALJ further found, evidence of malingering showed the plaintiff's subjective complaints were not as severe as she alleged (Tr. 563). She gave poor effort on resistive muscle testing of the upper extremities in December 2008 (Tr. 498-500). Dr.

Barnes found she had positive Waddell's sign in January 2012 during her orthopedic evaluation (Tr. 863-66), and Dr. Keith noted that "[t]here should be some concern that she was not putting forth sufficient effort" during her psychological evaluation (Tr. 950-56).

The ALJ noted other inconsistencies and "strange and unusual presentations to physicians" that detracted from the plaintiff's credibility (Tr. 563). For example, in December 2008, the plaintiff expressed no interest in trigger point type or epidural injections, citing an aversion to needles, which Dr. Tebalt thought was "a bit ironic in that she [had] several tattoos, including a tattoo in the lower back area" (Tr. 498-500). In May 2009, she reported extreme pain to Dr. Tebalt; however, Dr. Tebalt noted she did not appear to be in much pain. She was "eating a bag of McDonald's food and did not take the time to stop eating to do the pain assessment with the nurse." In her pain drawing, she "circled her entire body." Dr. Tebalt noted she appeared "distracted and uninterested in the visit" and "continued to eat her breakfast while she was speaking to [him] about her pain" (Tr. 818). At an emergency room visit in October 2009, she "actively, continuously texted on her Blackberry" and "ha[d] to be interrupted to make eye contact and give her history of symptoms" (Tr. 932-39). When she went to the emergency room in June 2011, she was "cussing, saying the 'F' word with any touch of [her] tender area in front of her young child." When this spurred hospital personnel to clear the examination room of visitors, the plaintiff was "adamant against the removal of the minor child, and stated 'it was none of [their] business what [she] sa[id] in front of [her] child'" and "'[she] could say what [she] want[ed] to.'" The plaintiff then left the emergency room stating that she would be filing a complaint (Tr. 877-78). *See Mickles v. Shalala*, 29 F.3d 918, 930 (4th Cir. 1994) (ALJ did not err by considering the inconsistency between claimant's level of treatment and her claims of disabling pain).

As the ALJ further found, the plaintiff's subjective complaints were inconsistent with her failure to follow treatment (Tr. 562-63). In December 2008, the plaintiff was

discharged from physical therapy for failure to attend appointments (Tr. 478). The plaintiff continued to smoke cigarettes (Tr. 795-96, 950-56), despite admonitions to stop (Tr. 858, 860). The ALJ also noted that the plaintiff was seen by two different neurologists and two different pain management specialists without explaining why she stopped seeing the previous providers (Tr. 562-63). The plaintiff argues that the ALJ erred in considering the foregoing evidence without developing the record by questioning her as to her reasons for not following through with recommendations of her doctors or as to her reasons for changing providers (pl. brief at pp. 10-12). However, even assuming the ALJ erred in considering this evidence, such error was harmless as the ALJ gave numerous valid reasons for discounting the plaintiff's credibility. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles*, 29 F.3d at 921 (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

Based upon the foregoing, the undersigned finds that the ALJ's credibility finding is based upon substantial evidence.

### Additional Evidence

The plaintiff submitted additional evidence with her initial brief. This evidence consists of a lumbar spine MRI study dated May 6, 2013, which showed four lumbar vertebral bodies resulting in disc space numbering discrepancy and a disc protrusion at L4-S1 that increased in size (as compared with the plaintiff's November 2008 MRI) with impingement of the left descending S1 nerve root, and a lumbar spine x-ray dated the following day that showed hypoplastic ribs at T12 with four lumbar vertebral bodies (*see* doc. 13-1).

These records were not included in the certified administrative record, and the court therefore cannot consider them. *See* 42 U.S.C. § 405(g) ("The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,

or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."). The court may consider extra-record evidence only in limited circumstances. Sentence six of 42 U.S.C. § 405(g) permits remands for new evidence "only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . ." 42 U.S.C. § 405(g). Remand on the basis of new evidence is appropriate if: 1) the evidence is relevant to the determination of disability at the time the application was first filed; 2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; 3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and, 4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir.1985)[4] (citing 42 U.S.C. § 405(g)).

Here, the plaintiff did not ask in her initial brief that the court remand this case pursuant to sentence six, nor did she articulate how the new evidence meets the *Borders* requirements. The plaintiff simply attached the evidence and stated that "[t]his MRI is relevant to this appeal as prior MRI's have assumed that [the plaintiff] had five lumbar vertebral bodies, and this MRI clearly shows that L5 was never there" (pl. brief at p. 3). In her reply brief, the plaintiff argues that the evidence is material

> because it reveals a genetic abnormality, the absence of the L5 vertebra, which had not been mentioned by radiology reports since a 2001 CT scan [Tr. Page 440]. This recent Lumbar MRI showed disc space numbering discrepancy compared to the MRI performed on 11/24/08; disc protrusion at L4-S1 had increased in size and was *now impinging* upon the left

---

[4]"Though the court in *Wilkins* [*v. Sec'y of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991)] indicated in a parenthetical that *Borders*' four-part test had been superseded by 42 U.S.C. § 405(g), the Fourth Circuit has continued to cite *Borders* as the authority on the requirements for new evidence when presented with a claim for remand based on new evidence, and the U.S. Supreme Court has not suggested that the *Borders* construction of § 405(g) is incorrect." *Ashton v. Astrue*, C.A. No. TMD 09–1107, 2010 WL 3199345, at *3 n.4 (D. Md. Aug.12, 2010) (citing cases). *See Elkins v. Astrue*, C.A. No. 4:10-2648-TER, 2012 WL 602779, at *4 n.3 (D.S.C. Feb. 24, 2012).

> descending S1 nerve root and possibly also the right (emphasis added). These are significant findings in an objective test and as such, cannot but present a reasonable possibility of having changed the outcome of the prior proceeding.

(Pl. reply brief at p. 2) (emphasis in original).

The undersigned finds that the new evidence does not meet the requirements for a sentence six remand.  As the plaintiff herself points out, the record already contains evidence showing the absence of the L5 vertebra (*see* Tr. 440).  Moreover, the new evidence does not appear to be relevant to the determination of disability at the time the application was first filed as the MRI and x-rays were taken eight months after the ALJ's decision, and there is no indication that the increased size of the disc protrusion, increased compromise of the thecal sac and lateral recesses, and impingement of the left descending S1 nerve root (as compared to the plaintiff's  November 2008 MRI) were present during the period of time relevant to the disability determination in this case.  Accordingly, remand for consideration of this evidence is not warranted.

## CONCLUSION AND RECOMMENDATION

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge


March 17, 2014
Greenville, South Carolina

41